**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| **United States of America,** | **Criminal No. 06-CR-369 (RHK/SRN)** |
| **Plaintiff,** | |
| v. | **REPORT AND RECOMMENDATION** |
| **Santiago Carrillo Aguilar(1)** and **Victor Carrillo Aguilar(2),** | |
| **Defendants.** | |

Jeffrey S. Paulsen, Esq., Assistant U.S. Attorney, on behalf of Plaintiff

William M. Orth, Esq., on behalf of Defendant Santiago Carrillo Aguilar

Leon A. Trawick, Esq., on behalf of Defendant Victor Carrillo Aguilar

___

SUSAN RICHARD NELSON, United States Magistrate Judge

The above entitled matter comes before the undersigned United States Magistrate Judge on Defendant Santiago Carrillo Aguilar's Motion to Suppress Physical Evidence (Doc. No. 37) and Motion to Suppress Statements (Doc. No. 38), as well as Defendant Victor Carrillo Aguilar's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 32.) This case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

## I.   BACKGROUND

An Indictment was filed on November 14, 2006, charging Defendants Santiago Carrillo Aguilar and Victor Carrillo Aguilar each with one count of possession of methamphetamine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A), and 18 U.S.C. § 2, and one count of possession of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), and 18 U.S.C. § 2.  (Doc. No. 14.)

David Sebesta, a police officer with the Bloomington Police Department, testified at the criminal motions hearing.  A taped copy of Defendant's October 28, 2006 interview was received into evidence at the hearing as Government Exhibit 1.  In addition, as an exhibit to its omnibus response to Defendants' pre-trial criminal motions, the Government submitted the search warrant, supporting affidavit, and receipt, inventory and return for an apartment in St. Paul, Minnesota, various vehicles and certain persons, including Defendants.  The Court will refer to these documents as Government Exhibit 2.  This matter is set for trial before United States District Judge Richard H. Kyle on a date to be determined.

## II.   FACTS

In August 2006, Officer David Sebesta of the Bloomington Police Department joined an ongoing investigation into a Hispanic organization's distribution of methamphetamine and cocaine in western Wisconsin and the Minneapolis-St. Paul area.  (Search Warrant App. and Aff., Govt. Ex. 2.)  When he applied for the search warrant at issue in this case, Officer Sebesta had been a law enforcement officer since 1978 and had been employed with the Bloomington Police Department since 1980.  Since 1989, he has been a member of the Bloomington Police Department's Special

Investigations Unit, and his primary duty in this capacity has been investigating narcotics violations. In this role, he has served with the Minneapolis Drug Enforcement Administration Task Force for approximately nine years.

In September 2006, Officer Sebesta received information from a cooperating defendant that a person known as "Don" was selling methamphetamine for this organization. (Search Warrant App. and Aff., Govt. Ex. 2.) In addition, the cooperating defendant stated that Don was driving several vehicles including a Ford F-150 truck, a green sedan, and a Ford Taurus, and provided the license plate numbers of these vehicles. (Id.) In addition, Officer Sebesta learned from the cooperating defendant that the Ford F-150 was used to transport narcotics from Phoenix, Arizona to Minnesota using a hidden compartment in the axle. (Id.) Defendant Santiago Carrillo Aguilar was the registered owner of the Ford F-150. (Id.) Finally, the cooperating defendant conveyed to Officer Sebesta that the members of the organization had prior drug arrests, were utilizing fake names and identification, and had in their possession a .22 caliber handgun. (Id.)

On September 28, 2006, the cooperating defendant notified Officer Sebesta that Don was driving the green sedan. (Id.) A Bloomington Police Department squad car located and stopped the vehicle for a traffic violation. (Id.) The vehicle's driver was identified as Defendant Santiago Carrillo Aguilar and the passenger was identified as Humberto Juarez Acosta[1]. (Id.) After the traffic stop, police officers followed the green sedan to an apartment complex in St. Paul, where they observed Defendants enter a certain apartment. (Id.)

---

[1] Humberto Juarez Acosta was later identified as Defendant Victor Carrillo Aguilar.

Police officers conducted subsequent surveillance of the apartment complex and observed the various vehicles described by the cooperating defendant parked at the complex, or nearby. (Id.) Neither Defendant was a listed resident of the apartment, nor were the apartment's utilities registered in either of their names. (Search Warrant App. and Aff., Govt. Ex. 2.) On the afternoon of October 5, 2006, Officer Sebesta observed the Ford F-150 inside a garage within the apartment complex. The green Ford Taurus, an additional pickup truck and several Hispanic males were present alongside the Ford F-150, which appeared to be partially dismantled. (Search Warrant App. and Aff., Govt. Ex. 2.) The Ford F-150 pickup was eventually observed leaving the garage and was not seen at the complex for an extended period of time. (Id.) According to the cooperating defendant, Don had driven the Ford F-150 to Phoenix to acquire more narcotics. (Id.)

Officer Sebesta later learned that the apartment complex management had spoken with the two Hispanic males working on the Ford F-150 in the aforementioned garage, and that these men had informed management that they were staying with a friend in the apartment under investigation. (Id.) Through further research, Officer Sebesta learned that an individual named Wole Alalade Alabi was the listed renter of the apartment since October 2005, and that the garage where he had observed the Ford F-150 was assigned to that apartment. (Id.) Moreover, until two months earlier, Mr. Alabi was subletting the apartment to a female individual, but had indicated to management that he intended to move back into that apartment. (Id.)

On October 19, 2006, Officer Sebesta learned that all vehicles required a permit to park at the apartment complex, and that the green Taurus's parking permit was actually issued to a BMW registered to Mr. Alabi. (Id.) Management had previously discussed the Taurus's parking permit with

4

Mr. Alabi, who stated that he had replaced the BMW with the Ford Taurus. (Id.) Mr. Alabi also informed them that he owned a truck and would acquire a parking permit for it as well. (Id.) Nonetheless, when Officer Sebesta visited Mr. Alabi's place of employment, he observed the BMW to which the parking permit had been assigned. (Id.) He observed only Hispanic males driving the Taurus, and never someone matching Mr. Alabi's description. (Search Warrant App. and Aff., Govt. Ex. 2.) From Minnesota Driver and Vehicle Services, Officer Sebesta discovered that Mr. Alabi lived at another residence in St. Paul and that he had several vehicles registered to that address. (Id.) Officer Sebesta drove by his residence on several occasions and observed the BMW parked there. (Id.) Mr. Alabi had also listed this St. Paul residence during prior contacts with the St. Paul Police Department. (Id.) Information subpoenaed from Xcel Energy listed Mr. Alabi as the current customer at his St. Paul residence, but a "Wole Nabi" as the customer for the apartment under investigation. (Id.)

On October 22, 2006, Officer Sebesta received information that Don had returned to Minnesota bearing a new shipment of narcotics. (Id.) Surveillance of the apartment complex confirmed the presence of the Ford F-150. (Id.) On October 24, 2006, an airport K-9 handler ran his certified drug detection dog, "Brio," by the Ford F-150 and another sedan, both parked at the complex, as well as the garage assigned to, and the door of, the apartment under investigation. (Id.) The dog alerted positive for the presence of controlled substances in the sedan and the apartment, but not in the Ford F-150 or the garage. (Id.)

Sometime in the next three days, Officer Sebesta instructed the cooperating defendant to contact Don and purchase a quantity of methamphetamine. (Id.) Immediately after the cooperating

5

defendant succeeded in making contact with Don, surveillance officers observed a Hispanic male exit the apartment and drive the Ford Taurus to meet the cooperating defendant. (Id.) At this meeting, the cooperating defendant purchased methamphetamine with pre-recorded funds. (Id.) The cooperating defendant identified the Hispanic male as Don. (Id.) Surveillance officers followed Don back to the apartment complex and watched him enter the apartment under investigation. (Id.)

On October 27, 2006, Officer Sebesta applied for a search warrant. In the affidavit supporting his application for a search warrant, he stated that, in the course of his two month investigation, he had never seen Wole Alabi, or any of his listed vehicles, at the apartment complex. (Id.) He noted that he believed that Wole Nabi was an alias for Wole Alalade Alabi and that Mr. Alabi / Nabi was falsely claiming to live at the apartment under investigation in order to provide an anonymous location where Defendants could conduct their drug trafficking operation. (Id.)

He further noted that, as a result of his training and experience, he believed that quantities of narcotics, as well as other evidence of narcotics trafficking, would be found at Mr. Alabi / Nabi's St. Paul residence, the apartment under investigation, garages or outbuildings assigned to these properties, as well as in the various automobiles mentioned in the affidavit and on the persons of Mr. Alabi / Nabi, Defendants and yet unnamed conspirators. (Id.) A search warrant authorizing a search of the apartment under investigation, the persons of Wole Alalade Alabi and Defendants, and the various vehicles described in the affidavit was issued on October 27, 2006, and executed on October 28, 2006. (Id.) In the course of their search of the apartment under investigation, the police recovered evidence of narcotics trafficking, including several packages of narcotics, scales, and baggies, among other items. (Id.)

Defendant Santiago Carrillo Aguilar was arrested on October 28, 2006 for drug offenses. (Id.) Eventually, he was brought to the Bloomington Police Department for questioning. Officer Sebesta, Special Agent Jeff Harford and certified Spanish translator Aldo Ramos conducted the interview. Officer Sebesta testified that it is his custom to begin interviews of suspects by providing background information on the police investigation which has lead to the suspect being questioned, and then administer the Miranda warnings. According to Officer Sebesta, he would only begin questioning after the suspect provided a valid Miranda waiver.

However, contrary to his usual practice, he testified that he simply forgot to provide Defendant Santiago Carrillo Aguilar with any Miranda warnings before beginning questioning. As the interview progressed, Defendant Santiago Carrillo Aguilar made various incriminating statements regarding the drug trafficking operation under investigation and the contents of the apartment. Approximately fifty minutes into the interview, Officer Sebesta realized his omission and stepped outside to confirm with Special Agent Harford that he had forgotten to administer the Miranda warnings. This break in questioning was less than one minute in duration. The officers returned to the interview room and Officer Sebesta explained his mistake to Defendant Santiago Carrillo Aguilar. He then administered the Miranda warnings from his DEA-issued card.

Officer Sebesta's subsequent discussion with Defendant Santiago Carrillo Aguilar became intertwined with a discussion about notification of the Mexican Consulate regarding the arrest. Defendant's statements expressed confusion regarding either the Miranda rights or the consulate notification process, and Officer Sebesta attempted to clarify Defendant's comments by asking him if he should read the Miranda rights again. Defendant answered that he understood his Miranda rights and

stated that a second reading would be unnecessary. Defendant also made comments about speaking with a legal representative. Officer Sebesta made further attempts to clarify whether Defendant Santiago Carrillo Aguilar wished to notify the Mexican consulate or wished to a have a lawyer present who could aid him with answering questions. After satisfying himself that Defendant was not seeking to have counsel present during the investigation, Officer Sebesta continued to ask Defendant Santiago Carrillo Aguilar questions regarding the narcotics trafficking operation and the contents of the apartment. According to Officer Sebesta, Defendant Santiago Carrillo Aguilar then made incriminating statements of a broader scope than those he had made prior to the <u>Miranda</u> warnings. In addition, at no point did he again ask for a lawyer or ask to stop the interview.

Defendants have filed motions seeking the suppression of the evidence seized from the apartment, and Defendant Santiago Carrillo Aguilar has a filed a motion that seeks the suppression of any incriminating statements made after Officer Sebesta administered his <u>Miranda</u> warnings.

### III. MOTIONS TO SUPPRESS EVIDENCE SEIZED

Defendant Santiago Carrillo Aguilar moves the Court to suppress the evidence obtained at the apartment on the grounds that the affidavit supporting the search warrant failed to set forth probable cause to support its issuance. Defendant Victor Carrillo Aguilar seeks the suppression of the evidence seized from the apartment for various unspecified Fourth Amendment violations. The Government describes these motions as boilerplate and urges the Court to deny them as such.

To evaluate Defendants' contentions, the Court turns to the inquiry of whether the "four corners" of the warrant affidavit supplied a substantial basis for concluding evidence of wrongdoing would be found in the place to be searched. Specifically, the search warrant application sought

authority to seize evidence related to narcotics dealing, including controlled substances and firearms. (Search Warrant App. and Aff., Govt. Ex. 2.)

"It is well-established that courts may *not* look to facts outside the affidavit in determining the existence of probable cause," United States v. Martin, 833 F.2d 752, 757 (8th Cir. 1987) (Lay, C.J., concurring), cert. denied, 494 U.S. 1070 (1990); rather, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." United States v. Etheridge, 165 F.3d 655, 656 (8th Cir. 1999)(internal citation omitted).

"Probable cause exists if, based upon a common-sense consideration of all the circumstances set forth in the supporting affidavit, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Curry, 911 F.2d 72, 75 (8th Cir. 1990) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." Zurcher v. Stanford Daily, 436 U.S. 547, 556 (1978).

Importantly, "[f]inely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision" as to whether a showing of probable cause has been met. Illinois v. Gates, 462 U.S. 213, 235 (1983). Rather, "'in dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Id. at 231 (citations omitted).

"[T]he preference for warrants is most appropriately effectuated by according great deference

to a magistrate's determination" as to the existence of probable cause. United States v. Leon, 468 U.S. 897, 914 (1984)(internal citation omitted); accord Gates, 462 U.S. at 236-37.  In this regard, this Court does not make a de novo review of the sufficiency of the affidavit.  Gates, 462 U.S. at 236; accord United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986) ("[A] district court should not make a de novo determination of probable cause . . . .").  Rather, "the decision to issue the warrant is to be upheld if supported by substantial evidence in the record," Reivich, 793 F.2d at 959, or, in other words, "so long as the [issuing Judge] had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing." Gates, 462 U.S. at 236.  Moreover, a court "may properly rely on normal inferences drawn by the surrounding circumstances and the allegations of facts contained in the affidavit."  United States v. Carlson, 697 F.2d 231, 238 (8th Cir. 1983).

"[W]hen an affidavit is based in substantial part on information from an informant, the informant's reliability, veracity, and basis of knowledge are relevant considerations–but not independent, essential elements–in finding probable cause." Reivich, 793 F.2d at 959 (citing Gates, 462 U.S. at 230); accord, e.g., United States v. LaMorie, 100 F.3d 547, 553 (8th Cir. 1996).  The information from a CRI is sufficiently reliable if it is corroborated by other evidence, or if the informant has a history of providing reliable information.  United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993).  In the end, these considerations "should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question" of whether in the totality of the circumstances the issuing Judge had a substantial basis for concluding that probable cause existed. Gates, 462 U.S. at 230, 236.

Officer Sebesta's affidavit sets forth evidence of a controlled buy from Defendant Santiago

Carrillo Aguilar, information observed by a cooperating defendant, Officer Sebesta's personal observations, facts gathered by other officers involved in the investigation, as well as inferences drawn from Officer Sebesta's knowledge and experience, all of which support the conclusion that narcotics trafficking was occurring at the apartment to be searched.

The affidavit states that, on September 28, 2006, Defendant Santiago Carrillo Aguilar was stopped by Bloomington police officers for a traffic violation while driving a green sedan which, according to a tip from the cooperating defendant, would be driven on that date by "Don," a methamphetamine trafficker with the organization under investigation. After the stop, Defendant Santiago Carrillo Aguilar, along with Defendant Victor Carrillo Aguilar, who was a passenger, were followed by police officers back to the apartment at issue.

Further police investigation revealed that the apartment was rented in the name of another person who was never observed there, nor were his cars were ever present there. Instead, the Ford F-150 pickup registered to Defendant Santiago Carrillo Aguilar, and other vehicles bearing the parking permits assigned to the supposed renter's vehicles were parked at the apartment complex. In August 2006, the cooperating defendant had informed Officer Sebesta that this Ford F-150 was used to transport drugs from Phoenix, Arizona to Minnesota in a hidden compartment in the axle.

On October 22, 2006, the cooperating defendant provided a specific tip that narcotics had been transported from Phoenix, Arizona, and the Ford F-150 reappeared at the apartment under investigation. On October 24, 2006, the police ran a certified drug detection dog by the vehicle and the apartment's door, and the dog alerted positive to the presence of controlled substances. Finally, Defendant Santiago Carrillo Aguilar emerged from the apartment to sell methamphetamine to the

cooperating defendant and then returned to the apartment following the sale. Therefore, the cooperating defendant's tips were largely corroborated by independent investigation. Officer Sebesta attested that, from his knowledge and experience, it is a common practice for drug traffickers to utilize residences, vehicles and other items in fake names in an attempt to mask their drug trafficking activities and true identities.

On the basis of the above facts, as set forth in Officer Sebesta's affidavit, the Court finds that there was more than sufficient probable cause to issue the challenged search warrant. Accordingly, the Court recommends that Defendants' motions to suppress the evidence seized at the apartment be denied.

### IV.   MOTION TO SUPPRESS STATEMENTS

Defendant Santiago Carrillo Aguilar moves the Court to suppress any incriminating statements that he made in his October 28, 2006 interview with Officer Sebesta and Special Agent Harford. He argues that the Court should suppress these statements because Officer Sebesta began questioning without administering a proper <u>Miranda</u> warning, and the <u>Miranda</u> warning that he administered fifty minutes into the interview was not effective under <u>Missouri v. Seibert</u>, 542 U.S. 600, 615-616, 620-622 (2004). (Def.'s Mem. Supp. Mot. Supp. at 4.) Moreover, he contends that he never effectively waived his <u>Miranda</u> rights after receiving the <u>Miranda</u> warnings because he asked to speak with a lawyer. (<u>Id.</u> at 5.)

As a preliminary matter, the Government has agreed to forgo the use of any incriminating statements made before Officer Sebesta administered the <u>Miranda</u> warnings. However, the Government contends that the Court should deny Defendant Santiago Carrillo Aguilar's motion as it

pertains to his post-warning statements, arguing that Seibert only requires the suppression of incriminating statements when government agents engage in a deliberate strategy to circumvent Miranda, and Officer Sebesta's failure to give the Miranda warnings was inadvertent. (Gov't.'s Mem. Opp. Mot. Suppress at 1.) Moreover, the Government argues that Defendant Santiago Carrillo Aguilar knowingly and voluntarily provided a Miranda waiver following the warnings, and, therefore, the statements are admissible. (Id. at 3.)

The Fifth Amendment privilege against self-incrimination protects individuals from being forced to testify against themselves. U.S. Const. amend. V. Miranda warnings must be given before any interrogation of a suspect in custody may take place. Miranda v. Arizona, 384 U.S. 436, 460-61 (1966). Before the government may introduce an incriminating statement made by a defendant, it must prove a voluntary, knowing and intelligent waiver of the accused's rights under the Fifth Amendment. Id. at 475.

### A. Effectiveness of The Miranda Warnings

In Missouri v. Seibert, 542 U.S. 600 (2004), the United States Supreme Court addressed when a "two-step interrogation technique" passes muster under Miranda. The Court noted that some officers employing this technique would first deliberately fail to give Miranda warnings and begin questioning a suspect, usually until they elicited a confession. Id. at 605-06, 609-11. Those officers would then administer the Miranda warnings and try to elicit a second confession. Id. Previously, under Oregon v. Elstad, 470 U.S. 298, 300 (1985), courts often upheld the admissibility of the second confession. Id. at 609-11.

In Seibert, a plurality of four justices questioned the effectiveness of the Miranda warnings

when they were administered immediately following a confession. Id. at 612-617. Justice Kennedy provided the fifth vote when he concurred in Seibert; in the Eighth Circuit, his concurrence is controlling. United States v. Ollie, 442 F.3d 1135, 1142 (8th Cir. 2006) ("Because Justice Kennedy provided the fifth vote and his concurrence resolved the case on narrower grounds than did the plurality, it is his reasoning that rules the present case.") *citing* Marks v. United States, 430 U.S. 188, 193 (1977). Under Justice Kennedy's approach, courts must

> suppress post-warning statements where the police intentionally used the two-step interrogation technique to render the Miranda warnings ineffective; Such statements would be inadmissible unless the police took curative measures that would ensure that a reasonable person would understand his or her rights.

Ollie, 442 F.3d at 1142; See also United States v. Blackbear, 422 F.3d 658, 664 (8th Cir. 2005); United States v. Briones, 390 F.3d 610, 613 (8th Cir. 2004), cert. denied 545 U.S. 1122 (2005). In the Eighth Circuit, the government bears the burden of proving by a preponderance of the evidence that "the officer's failure to provide warnings at the outset of questioning was not part of a deliberate attempt to circumvent Miranda." Ollie, 442 F.3d at 1143.

Officer Sebesta testified that he inadvertently forgot to administer the Miranda warnings to Defendant Santiago Carrillo Aguilar. He further stated that this was the first time in his extensive law enforcement career that he had forgotten to administer the Miranda warnings to a suspect. After returning to the interview room following his brief conversation with Special Agent Harford, Officer Sebesta said, "I'm sorry. I've just had a revelation. (sigh) I think I forgot to read you your Miranda warnings."

Defendant Santiago Carrillo Aguilar urges the Court to discredit Officer Sebesta's testimony.

14

He argues that Officer Sebesta and Agent Harford have a combined sixty years of law enforcement experience between them and, therefore, it is hard to believe that they would inadvertently fail to read him his Miranda warnings. (Def.'s Supplemental Mem. Supp. Mot. Suppress at 2.)

After listening to the tape recorded interview and considering Officer Sebesta's testimony at the criminal motions hearing, the Court finds that Officer Sebesta's testimony is credible and that the Government has shown by a preponderance of the evidence that Officer Sebesta did not deliberately use the two-step interrogation technique to make the Miranda warnings ineffective. The Court finds Defendant's attack on Officer Sebesta's credibility speculative. No testimony was elicited which would undermine Officer Sebesta's credibility.

As the Court has found that Officer Sebesta did not intentionally withhold the Miranda warnings at the outset of the interview, Seibert does not require the Court to suppress any incriminating statements made after Defendant received his Miranda warnings. Ollie, 442 F.3d at 1141.

**B.    The Miranda Waiver**

The Court next addresses Defendant's contention that his Miranda waiver was not knowing and voluntary under the totality of the circumstances[2]. In Seibert, Justice Kennedy's concurrence made clear that, in those cases where a "mid-stream" administration of the Miranda warnings resulted from mistake, rather than a deliberate attempt to circumvent Miranda, the effectiveness of the warnings and the legitimacy of any waiver would continue to be governed by Oregon v. Elstad, 470 U.S. 298, 300

---

[2]While Defendant emphasizes that he made reference to a lawyer on more than one occasion, he does not argue that these references were unequivocal as to trigger the protections of Edwards v. Arizona, 451 U.S. 477, 485 (1981). See United States v. Davis, 512 U.S. 452, 459 (1994).

(1985). In Elstad, discussing the admissibility of subsequent, warned statements, the Court judged such statements by analyzing whether they were knowingly and voluntarily made. Elstad, 470 U.S. at 304-07. The Supreme Court stated:

> It is an unwarranted extension of Miranda to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

Elstad, 470 U.S. at 309.

To determine if a defendant's testimony was given voluntarily, courts must ask whether, in the totality of the circumstances, law enforcement officials obtained the evidence by overbearing the will of the accused. See Haynes v. Washington, 373 U.S. 503, 513-14 (1963). The factual inquiry centers upon (1) the conduct of the law enforcement officials in creating pressure; and (2) the suspect's capacity to resist that pressure. See Mincey v. Arizona, 437 U.S. 385, 399-401 (1978). Likewise, a waiver is knowing and intelligent if it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998).

There is no evidence to suggest that Defendant Santiago Carrillo Aguilar's will was in any way overborne by the interviewing officers. Defendant Santiago Carrillo Aguilar has not alleged that he was handcuffed or otherwise subjected to duress. He has not alleged that the interpretation provided by Interpreter Aldo Ramos was inaccurate. Moreover, Officer Sebesta testified that he did not make any

16

threats or promises to Defendant Santiago Carrillo Aguilar, and that Defendant Santiago Carrillo Aguilar did not request to terminate the interview at any point. Defendant Santiago Carrillo Aguilar himself said that he understood the nature of the Miranda warnings and did not need Officer Sebesta to read them again. Therefore, he indicated both that he understood the nature of the right and the consequences of continuing to speak, namely that his statements could be used against him in court. The Court acknowledges that the administration of Defendant Santiago Carrillo Aguilar's Miranda rights and the notification of the Mexican consulate did become intertwined and that Defendant Santiago Carrillo Aguilar did make vague references to a legal representative. The Court nonetheless finds that Officer Sebesta made considerable efforts to clarify whether Defendant wanted a lawyer and expressly offered to stop the interview if Defendant wished to speak with a lawyer. The Court finds that Defendant Santiago Carrillo Aguilar made a knowing and voluntary waiver of his Miranda rights.

### C. Conclusion

As the Court finds that Officer Sebesta's two-step interrogation passes muster under Seibert and that Defendant Santiago Carrillo Aguilar's waiver of his Miranda rights was knowing and voluntary, the Court recommends that his Motion to Suppress Statements be denied.

**THEREFORE, IT IS HEREBY RECOMMENDED that:**

1. Defendant Victor Carrillo Aguilar's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 32) be **DENIED**;

2. Defendant Santiago Carrillo Aguilar's Motion to Suppress Physical Evidence (Doc. No. 37) be **DENIED**;

3. Defendant Santiago Carrillo Aguilar's Motion to Suppress Statements (Doc. No. 38) be **DENIED**.

Dated: February 22, 2007

        s/ Susan Richard Nelson

SUSAN RICHARD NELSON
United States Magistrate Judge

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by **March 8, 2007,** after being served with a copy thereof. The objecting party must file with the Clerk of the Court and serve on all parties, written objections which specifically identify the portions of the proposed findings, recommendations, or report to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.